## WYNN vs. GARLAND.

There is no ground to impute fraud to one legally entitled to a pre-emption, on account of failure to give notice of his right to another, who subsequently settles upon the same land, and makes valuable improvements thereon: nor on account of his omission to select, until the last day allowed by law for proof and payment, which of two tracts of land, upon both of which his improvement extended, he will elect to take.

There is no doubt of the regularity and validity of the action of the Land Department in annulling a pre-emption allowed by the Register and Receiver, upon proof of a legal pre-emption right to the same land under a prior law—all entries being *in fieri* until sanctioned by the President by the issuance of the patent.

Where a valid entry is set aside, and the land afterwards sold by the Government to another person, and the patent issued to him, he takes the legal title charged with the trust.

The decision of the Register and Receiver, in allowing a pre-emption, is examinable in a court of chancery, for fraud or mistake, at the suit of one legally entitled to a right of pre-emption in the same land.

And where a patent has been issued in such case, and fraud or mistake is clearly proven: as that the possession and cultivation of the patentee were not on the tract of land to which he proved up his pre-emption, but on an adjoining tract, a court of chancery will grant relief to the injured party.

The admission of a fact, when not operating as an estoppel, is but evidence of the existence of the fact; and when it is established by other evidence, that the fact admitted never had existence, and that the party making it, could have had no personal knowledge of the fact, such admission is not of much weight against him.

*Appeal from Lafayette Circuit Court in Chancery.*

Hon. SHELTON WATSON, Circuit Judge.

PIKE, for the appellant.   We apprehend that the counsel opposed to us hardly think of controverting the fact of mistake, at least; but rest their case on the broad position, that the decision of the land officers, as to the facts of cultivation and possession,

is *res adjudicata*, not examinable in equity upon the allegations and proof made in this cause.

The counsel appeared to rely, somewhat, in the court below on some statements of Wynn's, in his letters to the Commissioner of the General Land Office, as admissions of the fact of cultivation by Hemphill. Wynn was not in the country at the time, and had no personal knowledge of the facts of cultivation and possession by Hemphill. Vague confessions and admissions are the weakest of all possible testimony; and when hastily and inadvertently made, without investigation, are not binding. 1 *Greenlf. Evidence*, sec. 200; 17 *Mass.* 27; 3 *Sumn.* 435; 11 *Verm.* 138; 1 *Wend.* 625; 6 *ib.* 268, 277.

There is no dispute in this case as to Wynn's right to a preemption under the act of 1838, in case Garland cannot hold the land against him under the pretended pre-emption right of Hemphill.

The next question, therefore, is how far the decision of the Register and Receiver, as to the facts of cultivation by Samuel Hemphill in 1829, and occupancy in 1830, is conclusive. In other words, can the court go behind their decision, and re-examine those questions of fact upon allegations of fraud or clear mistake of fact in the evidence given before them.

By the pre-emption act of 1830, and the subsequent acts as to pre-emptions, the Register and Receiver are constituted a tribunal to receive testimony, and adjudge as between the claimant and the Government. Their proceedings are *ex parte*, without notice, actual or constructive, to individuals or the world.

Admitting that the land officers act judicially, and that they stand on the same high ground as courts of general jurisdiction, what is the rule as to judgments? Are they conclusive as to *facts*—as to the truth of the facts on which they are based, against third persons?

They prove, conclusively, that such a judgment was rendered; and as to parties and privies, they prove conclusively all facts which were directly in issue, and found to be true by the jury or

29B

court; but as to strangers, they are matters *inter alios acta*, and prove nothing whatever. 2 *Stark. Evidence*, 183, 184; 1 *Greenlf. Evidence*, secs. 522, 523, 538.

Wynn was no party to this proceeding before the land officers. He was not notified to be present—the proceedings were merely *ex parte*—there was no *lis contestatio*—he had no opportunity to produce witnesses, or cross-examine. And to hold him bound, under such circumstances, would be a total perversion of the principles of justice. 1 *Journ. du. Pal.* 560; 3 *ib.* 125; 19 *ib.* 698; *Pothier Part IV.*, chap. 3, art. 5, *No.* 900, 901, 902; *Taber vs. Perret*, 2 *Gallis.* 568; *Baring vs. Fanning*, 1 *Paine* 554; 7 *Cranch* 271; 11 *Wheat* 280; 3 *Har. & John.* 13; 6 *ib.* 182; 2 *J. J. Marsh.* 429, 440; 3 *Bibb* 174; *Denison vs. Hyde*, 6 *Con.* 518; *Shafer vs. Gates*, 2 *Ben Monroe* 453; *Englehead vs. Sutton*, 7 *How.* (*Miss.*) *Rep.* 99; *Nason vs. Blaisdell*, 12 *Verm.* 165.

As to the decision of the Register and Receiver in this case, the proceedings before them were not based on any allegation that the right to the land was to be determined between Garland and Wynn, or any other person than Garland and the Government, who were the only parties to the suit; that no notice was sought to be given: that the decision was only that Garland had made such proof as the Government required for its own satisfaction, and so only settled the question as between Garland and the Government; and therefore, was as to Wynn a nullity. *Browler vs. Edridge*, 18 *Conn.* 10; 9 *Cranch* 144; [8 *Sm. & Marsh.* 268; *Bird vs. Ward & Cravens*, 1 *Misso.* 398.

But we proceed further to say, that however conclusive the judgment may be held, and admitting that it stands on the same high ground as the sentence of a prize court, still it may be assailed for fraud, and its effect altogether avoided. *Bradstreet vs. Neptune Insurance Company*, 3 *Sumn.* 604; *Pratt vs. Northam*, 5 *Mason* 103; 1 *Greenl. Ev.*, sec. 541; *Sims & Wise vs. Slacum*, 3 *Cranch* 307; *Ammiden vs. Smith*, 1 *Wheat.* 447; *Fairfield vs. Baldwin*, 12 *Pick.* 388; *Borden vs. Fitch*, 15 *J. R.* 145; 5 *Ohio* 547; 11 *Mass.* 265; 3 *Day* 30; 2 *Watts* 180; 2 *ib.* 354; *White vs.*

*Jones*, 1 *Wash.* 116; 1 *Green* 263; 3 *Dessau.* 269; 1 *J. C. R.* 402; 1 *Ves.* 120; *Str.* 666; 2 *Cowen Rep.* 193; 2 *Hen. & Munf.* 136; 3 *J. C. R.* 275; 5 *ib.* 52; 7 *ib.* 182; 2 *Gill* 291; 1 *Har. & John.* 370; 2 *Har. & McHenry* 140, 244; 3 *Grattan* 315; 4 *Howard* (*Miss.*) *R.* 56; *McGill vs. McGill*, 4 *Annual Rep.* 266; 5 *Cranch* 196; 15 *Peters* 105; 7 *Wheat.* 1, 212, 140; 3 *Story* 536; *Ross vs. Lane*, 3 *Sm. & Marsh.* 547; *Niles vs. Anderson*, 5 *Howard* (*Miss.*) 365; *ib.* 562; 10 *Sm. & Marsh.* 295; *Rector vs. Welch*, 1 *Misso.* 335; 1 *Mon.* 256; 3 *ib.* 260; 2 *B. C. Howard* 318; 3 *Robins* 296; 4 *ib.* 79; 2 *Metc.* 138.

If the case were put on the mere ground of mistake, it would be the same. 1 *Story's Equity*, sec. 155, 166, 384.

There can be no doubt, that in this case a court of equity is competent to afford relief. As Wynn's right to a pre-emption, under the act of 1838, had accrued and become a vested one, before Hemphill's pre-emption was allowed, and it is clear that Hemphill really never was entitled to a pre-emption on that tract, and proved one either by wilful fraud, or ignorant mistake; and as consequently there was no pre-emption right to it in any one, conflicting with Wynn's, a court of equity will protect his rights.

WATKINS & GALLAGHER, for the appellee. We maintain that the complainant cannot, in this proceeding, impeach the title of Garland, either upon the ground of mistake in proving up the Hemphill pre-emption, or of fraud in procuring it to be done. Odious as fraud may and ought to be, where it exists, the principle applicable in this case to either ground, is, we think, the same.

We never heard it contended for, much less admitted, that the District Land Officers, for the adjudication of pre-emption claims, constituted a court of general jurisdiction, either *in personam* or *in rem*, or that their decisions were entitled to any such respect, infra, or extra, territorially. On the contrary, they form a court of special and limited jurisdiction. They are, if we may so speak, a quasi court—no more so than any board of commissioners, ap-

pointed by authority of law to hear testimony, and adjudicate any matter affecting the rights or interests of the Government. The act of Congress makes no provision for notice to any other parties, or to the world at large, and notice would not be presumed, because impossible. Arguments based on the supposed analogy between judgments *in personam* or *in rem*, and decisions in pre-emption cases, are only calculated to mislead the court,. and confound the whole subject. It would be a glaring absurdity to claim that a decision of the land officers concluded any rights but those of the claimant and the Government. *And as against the Government or' the claimant, their decision, if within the scope of their jurisdiction,* is CONCLUSIVE—a proposition in which the common sense usage of the Land Department, and every respectable judicial authority, concur—which is no where denied, and is all we contend for in this case.

When a Government undertakes to dispose of the property of its citizens—to determine private rights, by the judgment or condemnation of its courts, the forms of law, founded in reason and justice, require notice, actual or constructive, before the suitors can become parties to the judicial contract, which disposes of their property and concludes their rights. An act of legislation which professed to deprive a citizen of his property, in possession, or in action, without notice or trial, would be unconstitutional or outrageous oppression, without a constitution. But, when a Government, *for the disposition of its own property, or determination of claims against itself,* by general or special laws, establishes a tribunal, by whose decisions it agrees to become bound, it would be equally preposterous to suppose that any third person, other than the Government and the claimant, has a right to notice, or any pretence for assailing the decision, or impeaching its validity for any cause, much less on the ground that he had no notice of the proceeding.

Recurring now to the usage of the Land Department, entitled to respect and adherence, because important rights to vast amounts of property are connected with, and grow out of it, we find there

has never been a doubt as to the conclusive effect of a decision of the land officers. We refer to the opinion of Mr. BUTLER. 2 *Instructions & Opinions, No.* 57, *p.* 85. See, also, *Ib., No.* 64, *p.* 97; *Ib., No.* 88, *p.* 140, *No.* 682, *p.* 729.

The current of judicial decisions to the same effect, has been uniform. *McConnell vs. Wilcox,* 1 *Scam.* 344; *Wilcox vs. Jackson,* 13 *Peter's* 511; *Nicks vs. Rector,* 4 *Ark.* 283; *Finley vs. Woodruff,* 3 *Eng.* 341; *Grand Gulf Railroad Company vs. Bryan,* 8 *Sm. & Marsh.* 268; *Lytle vs. The State,* 9 *Howard U. S.* 333.

Claim to a pre-emption, is essentially a claim against the Government; notice of intention to make proof of it before the Register and Receiver, is not necessary. The fact of cultivation and possession, is a question solely between the claimant and the Government. The act of 1830 made no provision for notice or process of any kind.

A court of chancery sustains and enforces a prior equity against the elder grant perfected by a patent, by means of the doctrine of relation. A court of equity looks to the inception of the title. Where a patent is issued, it has relation to the inception of the title, and, according to that, is upheld or overthrown. Where, by decree overriding the patent, a prior equitable right is sustained, the title so acquired has relation to its inception. The pre-emption acts, like all other laws offering rewards upon conditions, are proffered contracts. *Lytle vs. The State,* 9 *How. U. S. Rep.* 334; *McAfee vs. Keirn,* 6 *Sm. & Marsh.* 789; *Taylor vs. Brown,* 5 *Cranch* 234; *McArthur vs. Brouder,* 4 *Wheaton* 488; *Fenley vs. Williams,* 9 *Cranch* 164; *Isaacs vs. Steele,* 3 *Scam.* 97; *Benner vs. Manlove, ib.* 339.

Admitting broadly the right of the United States to proceed to have canceled or vacated a patent which has improperly issued, or been unduly obtained, the proceeding of course implies that there is something to be investigated, some issue to be judicially determined. Admitting that—it is a disgraceful supposition that the Government ever did or would, or can condescend, to assign

or transfer its right or cause of action to impeach its own patent. When a prior pre-emption right is judicially established against a patent, the proceeding is not under the Government, but adverse to it; the suit is against the patentee, and succeeds, because the Government had no real or substantial interest to assign by grant or patent.

We say there are two classes of cases where title would be decreed against a patentee: one, where the complainant had an equity by privity of contract with the patentee, which by relation was an equitable estoppel; and the other, where a senior equity was asserted against a junior equity, improperly ripened into a legal title by patent. In either case, the complainant may show fraud or mistake; as, for example, obtaining the patent in violation of the contract, or in procuring the allowance of the junior claim by undue means, or in having prevented the complainant from obtaining a confirmation of his prior equity against the Government. So far as we are enabled to examine, all the authorities cited for the appellant fall within one or the other of these two classes of cases; and we do not believe that a respectable authority can be produced deciding that a patent, issued upon a senior claim, can be impeached at the suit of a private individual, and for the purpose of letting in a junior claim.

In *West vs. Jarrett*, 1 *Harris. & John.* 539, the title of the complainant was elder in its inception, and superior to that of the defendant. Of the case of *Garrettson vs. Cole*, *Ib.* 370, it may be said that the opinion of the *Chancellor*, so triumphantly quoted from, is altogether unintelligible—was predicated on an erroneous assumption of facts; and lastly, his decision was reversed in the court of appeals. In *Smith vs. Yates*, 2 *Har. & McHen.* 244, the complainant had the elder survey. In the *State vs. Reed*, 4 *Har. & McHen.* 10, the decree was to vacate a patent, which had been obtained by misrepresentation to the General Assembly, for land which, agreeably to an act of the General Assembly, *had been sold* to another person. In *Hagans vs. Wardens*, 3 *Grattan* 315, the complainant had the prior entry. In *Carter vs.*

*Spencer*, 4 *How. Miss.* 42, where Chief Justice STARKIE said: "The validity of a patent cannot be questioned, either in a court of law or equity, except on the ground of fraud or mistake " — though relief was denied, the case made by the bill was that defendant had fraudulently entered and obtained a patent for lands to which the complainant had a prior vested right of pre-emption. *McGill vs. McGill*, 4 *Annual Rep.* 266, needs no comment. *Bodley vs. Taylor*, before noticed, Chief Justice MARSHALL said "was an appeal from the decree of the court form the District of Kentucky, by which Taylor was directed to convey to Bodley and others a part of a tract of land to which he held an elder patent, but to which Bodley and others claim the better right under a junior patent." In *Brush vs. Ware*, 15 *Peters* 107, the court said: "The controversy in this case, does not arise from adverse entries, *but between claimants under the same warrant*. And it is admitted that Ware, as executor, had no power to assign the military right, which, on the decease of Hockaday, descended to his heirs. It is too clear to admit of doubt that Ladd, by circumvention and fraud, obtained the assignment from the executor, which enabled him to procure the warrant from the Register." In *Polk's Lessee vs. Wendall*, before noticed, the case, or the supposed case, was that the grant was absolutely void by the law of North Carolina. In *Miller vs. Keer*, 7 *Wheaton* 1, the decision was that where a superior equitable title was asserted against a patent, IT *was first open to examination*, and the complainant failed because his supposed prior equity was founded on a mistake. In *Hoffnagle vs. Anderson*, 7 *Wheat.* 212, Chief Justice MARSHALL thought the alleged prior equity was too vague and indefinite to prevail against a patent, though founded on a mistake. In *Bouldin vs. Massie's Heirs*, 7 *Wheat.* 122, where Chief Justice MARSHALL said: "The title of the person who has obtained it (the patent,) is undoubtedly examinable, but no presumption exists against him," the case was that the complainant claimed, as heir of Robert Jouette, to whom a military land warrant had been granted by the commonwealth of Virginia, and the

defendant claimed as assignee of Robert Jouette, and in that character had procured the patent. The complainant denied this assignment, "*on the existence and validity of which, the whole cause depended.*" It was a question of contract, both parties claiming under the same right. In *Niles vs. Anderson*, 5 *How. Miss.* 382, both parties claimed to have purchased a reservation from an Indian. The complainants' purchase, by which they acquired an inchoate equitable title, was prior to that of the defendants, whose purchase was made in fraud. In *Rector vs. Welch*, 1 *Missouri* 335, just where the quotation (in the argument for appellant) ends, the court proceed to say : "In either of which cases, it should be regarded as having no effect against a survey, or a New Madrid location, *made prior to its emanation.* In *Stoddard vs. Chambers*, 2 *Howard U. S.* 318, the case was that the senior claimants had the better right under a Spanish concession, opposed to a title having its inception subsequent to and conflicting with their elder right; and the conclusion of the whole matter was, that the patent of the defendant having issued for land which had been appropriated and reserved, was without authority of law, and *void.* In *Lott vs. Proudhome*, 3 *Robinson La.* 294, the location of the defendant was not made until after the plaintiffs had purchased. *Kitternege vs. Breand*, 4 *ib.* 79, needs no comment. If such authorities as those would aid the complainant's case, others might be added of like import. Thus, *Thredgill vs. Pintard*, 12 *Howard U. S.* 24, was a case of prior equity by contract—and so in *Bagnell vs. Broderick*, 13 *Peters* 450, and *Cromelin vs. Mintum*, 9 *Ala.* 594.

From the necessity of the case, and the uniform usage and construction of the law, making the President the head of the Land Department, and requiring him to see the laws faithfully executed, he acting through his subordinates, there has grown up a right of appeal to and power of revision in the Commissioner of the General Land Office, over the acts and decisions of the district land officers.

Here were two decisions, in favor of claimants, under different

acts, to the same tract, and upon questions of fact admitted to be within the jurisdiction of the land officers. It was the plain duty of the President to grant the patent to the person entitled to it as against the United States. It was no new case, nor a new question concerning the authority of the Commissioner by law and usage, with both adjudications and both claimants before him, to cancel the certificate which had improvidently issued, and award the patent to the claimant under the first law. That much remained for the President to do. *Dickinson vs. Brown,* 9 *Sm. & Marsh.* 136; *Lewis vs. Lewis,* 9 *Misso.* 183; *Miller vs. Ker,* 7 *Wheat.* 1; 3 *Rob. La. Rep.* 295.

We hardly deem it necessary to argue the matter of the alleged mistake. As a minor question, it depends on the other. It will suffice to say that the cases which the counsel for appellant has put by way of illustration, fall short of meeting the question. Various acts of Congress have made provision for the correction of admitted mistakes. This is not such a one. Hemphill and the witnesses were not mistaken about the locality or description of the tract to which they intended to prove up a pre-emption.

The testimony taken in this cause clearly shows that Hemphill was entitled to a pre-emption; and if there were any doubt upon this subject, the complainant himself has furnished evidence, in the face of which he can hardly ask this court to decree against Garland, upon any ground, much less that of intentional mistake or fraud. The counsel on the other side, has cited a long list of authorities to show, what he altogether overlooked in applying that rule to Garland, that proof of admissions is the weakest of all evidence; and he contends that the admissions of Wynn were made under a mistake. The rule stated is no doubt applicable to verbal admissions, where the question is as to the fact of the admission made in conversation. But these admissions of Wynn, *were made by him*— deliberately made in writing, while ingeniously and artfully representing his own case to the Commissioner, on the appeal, and arguing against that of Garland; and we think it demonstrable they could not have been made under a mistake.

Mr. Justice Scott delivered the opinion of the Court.

The land in controversy between these parties, is the north-east quarter of section eighteen, township sixteen south, of range twenty-five west. It is on the south side of Red River, in Lafayette county.

The bill was filed in the Circuit Court of that county, by Wynn against Garland, to enjoin him from proceeding at law to recover the possession of the premises, to quiet plaintiff in his possession, and for general relief. Upon the hearing, the injunction before granted, was dissolved; Wynn was denied all relief, his bill dismissed, and Garland decreed damages against him under the statute, to be ascertained by a jury. Wynn then brought the case here by appeal.

The transcript is quite voluminous. Besides lengthy pleadings, swollen by many exhibits, there are numerous depositions. It does not seem necessary to set these out, or State their substance beyond this, to wit:

Wynn claims the land under the pre-emption law of 1838. He made proof and payment under the provisions of that law, and obtained the usual patent certificate, on the 30th of November, 1842. There is no question but that he was entitled to purchase the land from the government, under that law, if no one had a superior right to purchase it under one of the prior pre-emption laws.

Samuel Hemphill, under whom Garland claims, asserted his right to purchase the same land under the pre-emption law of 1830; and, on the 19th of February, 1843, having made his proof under the provisions of that act, and the supplement to the same, to the satisfaction of the Register and Receiver of the proper Land Office, was allowed that day to pay out the land, and received the usual patent certificate for the same. This was regularly assigned to Garland; and, on the 9th of January, 1844, after having examined the testimony filed to sustain these two respective conflicting claims against the Government, the Commissioner of the Gen-

eral Land Office approved the last mentioned entry, upon the ground that the pre-emption right, under which it was made, was fully proven, and being under the law of 1830, must take precedence of Wynn's entry, which, although fully proven also under the provisions of the law of 1838, was subject to the senior right under the prior law; and, upon that ground, canceled the entry of Wynn, and approving that of Hemphill, on the next day, to wit: the 10th January, 1844, the patent was signed by the President, and issued to Garland as assignee of Hemphill, in the usual course.

Thus Garland has the legal title, perfected by patent, which he claims to be supported by an equity of Hemphill, as against the Government, under the law of 1830, while Wynn, upon the foundation of his claim under the law of 1838, denies, *in toto*, the alleged equity of Hemphill, and assails it in divers ways; mainly, however, for abandonment, fraud, and mistake—setting up his own claim under the law of 1838, as being both legal and equitable, and the only true pre-emption right to the land in controversy. There is a vast deal in the record, both in the pleadings and evidence, relating to the improvements upon the public lands, of each of these parties, and of those under whom they claim, as successors, their respective improvements, which seems to be mainly designed to show hardship, that can have no legitimate influence in the decision of the questions involved. And as to such matter, it may be sufficient to remark, that each party having had a pre-emption right under the law of 1830, as assignee of the respective possessors of that year, by virtue of the cultivation and possession of their respective assignors, under which each had the election to take either of two or more tracts of land, upon which the respective cultivation of their several assignors extended in the year 1829, neither could have any equity in *any other tract*, than that *one elected* to be taken, however valuable may have been their several improvements upon the tracts, not covered by their respective pre-emption purchases as located by themselves, for the reason that all such improvements had been

purchased or made at their own risk, like ordinary improvements upon the public lands, made with no reference to the acquiring of a pre-emption right.

And as to all such improvements, neither the Government, nor any purchaser from the Government, whether purchasing by virtue of a pre-emption right, or at auction sales of the Government, or by private entry, is to be held bound to respond to any supposed equity in the owners thereof, as against the Government, and her vendees are but simply intruders and trespassers.

Hence, as to all that class of claimants of the possession of the public lands, who may have thus improved, or purchased improvements upon the public lands, although their claims, while they continue to exist in fact, may be recognized and protected by our own State laws, as chattel interests, until such time as the Government, or her vendee, may assert the paramount title and interest in the soil, (when they at once cease to exist) there is no place for the application of the law of notice, because they have no such interest in, or title to the land as can be affected by any want of notice, unless it could be supposed that a court of equity would recognize, and protect as an equity against the owner, the fruits of an outright trespass upon his lands.

And for a like reason, it can have no place, as between claimants to a pre-emption to the same tract of land, under successive pre-emption laws; as for instance, under the law of 1830, and under that of 1838. Because, if the former exists in fact to a given tract of land, the latter does not exist at all as to that tract. A pre-emption right, under any circumstances, is essentially a claim against the Government; and, under such circumstances, is essentially a unit. To suppose two to exist in fact, under such circumstances, would be as absurd as to suppose that two bodies, each of which was sufficient to fill a given space, could occupy that space at the same time. If the first should not be forfeited by a failure to make the proof and payment within the time prescribed by law, and should be perfected by a compliance with all the requisites of the law, the latter, in contemplation of law, never had, for a

moment, any germ of existence; and, consequently, the occupier of the land, who claimed under the act of 1838, had no greater interest in it, to be affected by a want of notice, than the ordinary squatter, who pretended to no pre-emption claim at all.

So far as he was concerned, the law of 1838 had no more effect than if he had lived on his own land, instead of that of the public; because, in fact, he lived upon land, that had been, in effect, appropriated under the law of 1830; and, consequently, not upon land to which a pre-emption right, under the law of 1838, would attach.

It is true, that if the claimant, under the law of 1830, forfeited his claim, after a pre-emption right had vested in him by virtue of his cultivation in 1829, and possession in 1830, in consequence of a failure to comply with the conditions subsequently prescribed by that law, he (the claimant under the act of 1838,) would be entitled to the pre-emption right to the land; but this, if the forfeiture occurred after the time of the requisite cultivation and possession under the law of 1838, would be so only because the forfeiture, although occurring, in fact, after the requisite cultivation and possession under the law of 1838, would be held in law to relate to a prior time, in favor of the claimant under the law of 1838; so as to make the land unappropriated public land, at the time when his cultivation and possession in fact was had. Thus, in effect, the law would contemplate, that no claim under the act of 1830 ever did in fact exist, even in an inchoate manner.

Nor could the law of notice apply as between claimants under these two laws, although a claimant, under the former one, may have had the option, under its provisions, to select either one of two several tracts of land, and might not have made his election until after the time, when in fact the requisite cultivation, possession, and personal residence upon the tracts selected under the law of 1838, was fulfilled: provided the election was made within the time allowed by the law of 1830, and the supplements thereto; unless a court of equity would interfere in such a case, upon the ground

upon which that court interferes to marshal securities, when one party has a lien or interest in two funds for a debt, and another party has a lien or interest in one only of the funds for another debt, and compels the former party to resort to the other fund in the first instance for the satisfaction of his debt, if that course is necessary for the satisfaction of the claims of both parties. But although this doctrine is applied to judgment creditors, as well as to others holding ordinary securities, there seems no warrant in the authorities to extend it to parties who claim an interest in land, not by *way of security* for a debt merely, but by way of *absolute estate*. And inasmuch as when courts of equity interfere in cases of securities, it is only in those cases where such interference "will not trench upon the rights, or operate to the prejudice of the party entitled to the double fund," (*Story's Eq. Jur.*, *ch.* 13, 633,) it would seem that if the doctrine should be extended beyond securities, by parity of reason, this should be done upon a like condition, and it will not be contended that the frame of this bill has any capacity for relief in that view.

If the election between the tracts of land in this case, was in fact made within the time allowed by the law of 1830, and the supplement thereto, such election was as much "covered by the law," as was the previous cultivation and possession, and the subsequent proof and payment under its provisions.

As between the claimant and the Government it cannot be denied, but that under the act of 1830, there was no other restriction upon the time, when this election should be made, than there was upon the time when proof and payment should be made, and that these were as well made on the last day allowed, as upon any previous one; and that when made, the election—the proof and payment—the patent certificate, and the subsequent issuance of the patent, would all relate to the time of the inception of title by the cultivation in 1829, and possession in 1830, and would necessarily work an appropriation of the land from that time; and, consequently, exclude it from the operation of

any subsequent pre-emption law, which was to allow pre-emption rights against the Government to unappropriated public lands.

And as between a pre-emption claimant under the law of 1830, and another claiming through the Government, under the law of 1838, even supposing he could claim more in the land than the Government could from whom he claims, there could be no more ground to impute fraud to the former, from the fact that he had not made his election until the last day allowed him by the law of 1830, than there would be to impute fraud to a prior purchaser of land, who had failed to have his deed recorded within the time allowed him by law for this purpose; and of a deed, in a case of that kind, it is said, in the opinion of the court in the case of *Clark et al. vs. White*, 12 *Peters Rep.* 198, "that by the common law, it was valid without registration; and where the registry acts require deeds to be recorded, they are valid until the time prescribed by the statute has expired; and if recorded within the time, are as effectual from the date of execution, as if no registry act existed," and the court proceeds to hold, under the circumstances of that case, that because the conveyance in question was not filed for registration until the last day of the six months allowed by law for that purpose, fraud was not predicable upon the mere fact of non-registry, until the end of the time allowed by law.

And in the case of *Shinras et al. vs. Caig & Mitchell*, 7 *Cranch Rep.* 50, which came up from the Circuit Court for the district of Georgia, by the statute of which State a deed is valid, if recorded within twelve months, but any deed recorded within ten days after its execution takes preference of deeds not recorded within that time, or not previously on record, Chief Justice MARSHALL said: "It appears to the court that neither negligence, nor that fraud which is inferred from the mere fact of omitting to place a deed on record, can, with propriety, be imputed to the person who has used all the despatch which the law requires. If subsequent purchasers without notice sustain an injury within the time allowed

for recording a deed, the injury is to be ascribed to the law, not to the individual who has complied with its requisitions."

And the case at bar, in its facts, are much stronger on this point than any case like these could be, even if the neglect of registering a deed had been only for a week, instead of to the last day allowed by law, because whatever hardship may have resulted to Wynn from making or purchasing valuable improvements upon the land in question, prior to the return of the public surveys in 1841, it is utterly impossible to attribute any such hardship to Hemphill, or to Garland, who claims under him, for the simple reason that until the public surveys had been made, it was known to no one, that any part of Hemphill's improvement in the year 1830, was upon the quarter section of land in question.

Hence, neither the purchase of the improvement by Wynn of James, nor the valuable additions made thereto by himself, nor his residence thereon, on which he predicates his claim to a pre-emption under the law of 1838, could have been to any extent superinduced by any negligence or design on the part of Hemphill or of Garland, who succeeded him, in giving notice of that material fact. And indeed, if Wynn's complaint of the want of notice of Hemphill's pre-emption right to the land in controversy, is worth anything; it is so, because he lost a pre-emption right under the law of 1838, in consequence of Hemphill's negligence in giving him such notice. If he simply lost improvements upon the public lands, which laid no foundation in himself for a pre-emption right under any law, he has no cause for complaint, although Hemphill might have been negligent, or have given him no notice at all. Because, as to all such improvements as against the Government or her grantee, he was but a mere trespasser, and it is manifest, that he has no other than the latter ground of complaint, if irrespective of the question of notice, Hemphill's pre-emption right was not only good against the government, but Wynn also ; because, neither Hemphill or Garland, who succeeded him, could have been guilty of any negligence in giving

notice of an intention to claim the land in question, until after the return of the public surveys in 1841. Until then, the difficulty could not have been remedied, although Hemphill had himself continued to reside on his improvement up to the day of the surveys, and had continually made proclamation of his intention to assert all rights accrued, or to accrue to him, under the law of 1830, and the supplements thereto. Up to this time, then, Wynn could have had no other than the squatter's claim to the land, because it was not unappropriated public land, to which a preemption right under the law of 1838 could attach, however valuable may have been the improvements he purchased upon it, or those which he himself made in addition thereto. And he never could have obtained a pre-emption to the land, unless it had been subsequently forfeited to the Government, and by relation become unappropriated public land, *as of a date* to allow his cultivation of, and residence upon it in 1838, to spring up a pre-emption right to him, under the law of that year.

Now, supposing it to be conceded to Wynn, in the broadest sense, that Garland was bound to give him notice, at the earliest period practicable, of his intention to claim the land in controversy, and that it would be fraudulent in him, if he did not do so ; and hence, an equity would arise in favor of Wynn against Garland, for the full measure of any injury, that such a fraud would work to the lawful rights of Wynn; still, no one will contend that the failure of Garland to give Wynn such notice would work a forfeiture, as against the Government, of Hemphill's preemption claim, which Garland may be supposed to have asserted against the Government; and thus let in Wynn to a pre-emption right to the land under the law of 1838. Because, as between the pre-emptor under the law of 1830, and the Government, there is no such condition subsequent to work a forfeiture of the preemption right, as that the claimant shall give any notice at all to third persons, as we shall presently see more fully, nor any notice to the Government herself, beyond that which is included in the condition to make proof and payment within the time pre-

30B

scribed by the law of 1830, and the supplement thereto.  Hence, the measure of Wynn's equity against Garland, for a failure to give him the notice contended for, would not be the value of the pre-emption right to the land in question, because Wynn did not lose that by that failure on the part of Garland.  But the measure of his loss could only have been the value of the improvements put upon the land, in the interval between the making of the public surveys, and the entry of the land under the Hemphill pre-emption, less the value of the use of the land during that time. If, under the state of case we have supposed, it had been practicable for Garland to have given Wynn the notice contended for, in time for him to have gone on to another quarter section of public land, and obtained a pre-emption under the law of 1838, there would have been more ground upon which to suppose that the measure of his equity against Garland would have been the value of the land in controversy; because, in that case, it might be supposed he had lost a pre-emption right to a quarter section of land by such dereliction on the part of Garland. But, as he could have lost nothing, under the facts of this case, beyond the excess of the value of the permanent improvement (over the value of the use of the land during that time,) put upon it, during the interval mentioned; that alone was the measure of his equity, under such supposed state of case.

But in reality he had no equity at all of any measure, predicated upon a failure of Garland to give him notice of his intention to claim the land in controversy, under the Hemphill pre-emption, inasmuch as that failure could not work a forfeiture of that pre-emption, as against the government, and thus let him into a pre-emption right under the law of 1838.  Hence, having no right in the premises founded *in law*, he was incapable of injury, however much Garland might have infracted the conventionalities "of good neighborhood," by a failure to give him the notice contended for; his rights in the premises being nothing beyond the " squatter's rights, " at the mercy of the first lawful purchaser from the Government.  And it is, therefore, unnecessary to insist

upon the principles of law, which we have already cited, applicable as well to pre-emption rights as to the registration of deeds, which refuses to impute fraud, in the holder of an unregistered deed, to the mere fact of non-registry until the last day allowed by law, although the rights of subsequent purchasers, for a valuable consideration, may be thereby injured. Such injury being, in the language of Chief Justice MARSHALL, "to be ascribed to the law, and not to the individual who has complied with its requisites." Neither the pre-emptor nor the holder of the deed being required to do more for the protection of third persons, who must be presumed also to know the law, than is required of them by the law.

It results, then, that Wynn stands upon no other or broader ground of equity, than that which he may have against the Government by virtue of having brought himself within the provisions of the pre-emption law of 1838, so far as cultivation, possession and residence upon the tract of land in question were concerned, and the making of the proof thereof, and payment therefor, that were required by that law, within the time prescribed.

The circumstances that before the presentation of the pre-emption claim of Hemphill, Wynn had been allowed his claim under the law of 1838, and had entered the land by virtue of it, and received the ordinary patent certificate, in no way strengthens his case, or enlarges his basis of equity. Because, that having been allowed by the Register and Receiver, upon the then apparent ground that the land in question was unappropriated public land, to which a pre-emption right, under the law of 1838, would attach, his entry was afterwards set aside by the same officers, under the advice and instructions of the Commissioner of the General Land Office, whose action in the premises was afterwards ratified and approved by the President of the United States in the issuance of the patent to Garland, as assignee of Hemphill, to the same land, based upon the claim of Hemphill under the law of 1830, which had been regularly allowed by the same Register and Receiver, upon proof satisfactory to them

of the validity of that claim under the prior law, which of course was inconsistent with any claim under the subsequent law of 1838, and worked the annulment of the entry, even without the express order for cancelation that was in fact made by the Commissioner of the General Land Office, whose doings were approved by the President in the issuance of the patent to Garland, as assignee of Hemphill.

Without going at large into the subject, we will say, that we have no doubt of the regularity and validity of this action of the Land Department in annulling Wynn's entry. It was consistent with the uniform usage of the Government, as is to be gathered from the orders of the President, the opinions of the Attorney General of the United States, the instructions of the Commissioner of the General Land Office, and the act of Congress providing for the refunding of the purchase money, when entries are set aside. Besides, the power in question is expressly recognized in several judicial decisions. In the case of *Dickinson vs. Brown*, 9 *Sm. & Marsh.* 136, the court used the following language : "But admitting that it constituted a legal title, it was in proof that the certificate of entry had been canceled, and we cannot say that the Register and Receiver, with the approbation of the Commissioner of the General Land Office, had no power to cancel it. On the contrary, it is believed that such power is uniformly exercised. To a certain extent these officers have a discretion in such matters. They are empowered to hear and decide on a pre-emption right. As against the Government, the certificate is but an inchoate or incipient title ; the officers discovered that it had been improvidently issued, and canceled it, and issued a complete legal title to another and refunded, or offered to refund, the money paid." See, also, *Lewis vs. Lewis*, 9 *Missouri* 183 ; *Miller vs. Ker*, 7 *Wheaton* 1. In the case of *Lott vs. Proudhome*, 3 *Robinson Lou. R.* 295, the court said : "It does not appear that these patents have ever been vacated or annulled, nor are we acquainted with any law which authorizes the Commissioner to vacate a patent already issued. We repeat, however, what was said in the

case of *Guidry vs. Woods*, 19 *Lou. R.* 334, that we do not doubt the authority of the Commissioner of the General Land Office to declare void a certificate of purchase of lands which the law forbids to be sold or disposed of."

And indeed such a power would seem to be appropriately incident to that which authorizes the Executive Department to dispose of the public lands, which is founded upon no idea of sovereignty or lordship in reference to them, as resting in this department of the Government, but solely upon the laws of Congress providing for their disposition. Hence, the President and his subordinates, the Secretary, the Commissioner of the General Land Office, and the Register and Receiver of the proper Land Office, can dispose of a tract of land only in accordance with law, and any other disposition of it cannot be conclusive upon the rights of any lawful claimant, as against the Government.

When an equitable title, as against the Government, vests in any lawful claimant, the Government at once becomes a trustee for the legal title, and if that be afterwards improvidently issued to another person, he takes it charged in equity, with the trusts in favor of the equitable claimant.

As the successive steps, in procuring lands by purchase from the Executive Department, under the provisions of law for their sale, are upon the tacit condition that the acts of his subordinates in the premises will be ultimately approved, and sanctioned by the President, its head, the original entry is to be considered *in fieri*, until it receives this sanction by the issuance of the patent, which is *a record*. The disposition of land by the executive under the pre-emption laws, is but one of the modes of sale provided by law, and though at first the supervision of the President through the Secretary and Commissioner, which had always before been exerted as to the other description of sales, was not to the full extent exerted over *this* description of sales, this distinction was soon practically abandoned, and now for a long time, this description of sales has been placed upon the same footing as the others, so far as the supervising control of the Executive Of-

ficers above the Register and Receiver are concerned. And in these sales, as well as in the others, the President, through his appropriate Secretary, or the Commissioner of the General Land Office, exerts this control.

If upon the apparent ground of illegality in an entry, a valid one should be thus set aside, and the same land afterwards sold, in such case necessarily illegally sold, to another person, and patented to him, that person, as we have already remarked, would hold the legal title thus received, charged with the trusts that were upon it: and the injured party would be thus driven into a court of equity, where he would be allowed to set up his equitable title (founded upon his lawful claims to the land, as against the Government,) against the legal title thus illegally obtained. And the chancery courts, supposing such jurisdiction to be within the scope of the general action of a court of equity, affords relief in accordance with the settled principle of that court, as applicable to its general action in affording relief. Such seems to be the ground upon which this jurisdiction rests. Latterly, it has been very often invoked in cases of pre-emption right claimants. And doubtless, this has been stimulated, in no little degree, by the liberal interpretation which the Supreme Court at Washington has felt bound of late years to give to the laws of Congress, out of which these claims grew, in favor of this class of claimants. And scarcely less in the opening, to its greatest width, the door to this jurisdiction.

In earlier years that court said, in the case of *Polk's Lessee vs. Wendell*, 5 *Wheaton R.*, *p.* 302, that "long experience had satisfied the mind of every member of the court, of the glaring impolicy of ever admitting an injury beyond the dates of the grant under which lands are claimed." The cases of latter years would indicate that it had been found impossible under the law to uphold that policy.

What amount of evil, this latter current of decisions will cast upon the land States, and whether State legislation can sufficiently counteract it, remains to be seen. If it shall flow on, unchecked,

a few years longer, it would seem inevitable that much of the confidence hitherto reposed in land titles derived from the Government, must be overthrown; and, as a consequence to be deplored, emigration to the land States cannot fail, in a like ratio, to be lessened.

Upon allegations already indicated, Wynn invokes this jurisdiction ; and, to establish his own equity, seeks to show that the sale to Hemphill, which was perfected by the grant to Garland as his assignee, was illegal, upon the ground that the pre-emption right allowed to Hemphill under the law of 1830, was not a valid one ; and, consequently, no senior claim appearing in 1838, the land in controversy was in law unappropriated public land, to which his own claim under the law of that year attached.

If this was the true condition of the land at that time, his case for relief would have been made out, inasmuch as there is no dispute as to Wynn's cultivation and possession by personal residence, and as to his proof and payment within the time, under the provisions of the law under which he claims.

And this, although the Government, through its Executive branch, had allowed and sanctioned by grant, the claim of Hemphill under the law of 1830, in accordance with the decision, as to the facts of the cultivation and possession of the latter, of a tribunal by whose decisions it had agreed to be bound in the disposition of unappropriated public land, because the tribunal had no power to decide, and the President no power to sanction by grant, that Hemphill had a pre-emption right to lands to which Wynn had, by law, a vested right.

The objection that Hemphill was under the age of twenty-one years, and was not the owner of the improvement, is not sustained by the testimony. That founded upon his sale of the improvement and removal to Texas, and his taking the oath of allegiance to Mexico, is invalid. Continued residence not having been required of him, under the law of 1830, either to keep in life his pre-emption claim, as between himself and the Government, or as between himself and third persons, as a means of notice to

them. And his having become an adopted citizen of a foreign Government, did *not* work a forfeiture of any rights of his, vested by law, while a citizen of our own, although he had afterwards left this country and taken the oath of allegiance to a foreign Government, with the intent and effect to expatriate himself, as we have held in the case of *Wynn vs. Morris,* decided during the present term.

The validity of the remaining objection, must be determined upon the evidence : that is to say, that the cultivation of Hemphill in 1829, and his possession in 1830, upon the foundation of which his claim to the pre-emption that was allowed him, vested, did not in fact extend to the tract of land in controversy, but was exclusively upon other adjoining lands.

And although we shall not in terms sift out the good from the bad, we shall, in effect, do so, in endeavoring to consider only that evidence which is competent and relevant in ascertaining this point of fact.

In considering so much of it, as is offered upon the part of Wynn, it is impossible for us, after making abatement on the score of credibility for so much of it as is attacked on that ground, to resist the conclusion that the cultivation in question did not, in the year 1829 and 1830, reach to the land in controversy.

Much of this testimony is from individuals who must have had the best opportunity, the nature of the case would admit of, to know the facts and circumstances to which they depose ; and their testimony appears to have been given after the most careful inspection of the premises, with reference to natural objects, and actual surveys, which several of them witnessed. And after being thus enlightened, and their memory refreshed, they speak in confident and positive terms. And although there is some discrepancy among them in several particulars : mainly, however, as to courses and distances, measured by the eye, and not tested by the compass and chain, which, in terms, tend to conflict, yet all such is controlled by distinct expressions of the same witnesses, or to the utmost extent of the *western limit* of the im-

provement in question, based upon an actual examination of the premises, which, as they state, afforded data to enable them to speak with certainty as to this, when taken in connection with courses and distances ascertained by the surveys, which most of them witnessed, and their previous knowledge of the locality.

The testimony of Waggoner, on whose supporting affidavit, together with that of Cryer's, the pre-emption claim of Hemphill was allowed by the Register and Receiver, if taken to be worth anything, either for sustaining their decision originally or overturning it now, is far more favorable to Wynn than to the defendant; but we think it utterly worthless, for any purpose, in point of weight on either side. Cryer's testimony amounts to but a carefully expressed opinion by one who had had a reasonable opportunity to be informed with fair accuracy of the matters about which he testified; and would be entitled to much weight in the absence of other testimony equally credible from witnesses who had had a better opportunity to be informed with a higher degree of accuracy. He had never lived or worked on the premises, nor witnessed any of the surveys, nor compared notes with others upon the ground, in reference to natural objects, with which all had been more or less familiar, with a view to refresh his memory, and to abandon or reduce to greater certainty necessarily vague impressions, which he had formed without such careful and minute examination. Almost all his answers indicate vagueness, and want of positiveness in his impressions.

Samuel Hemphill, the pre-emptor, who had never been on his former improvement after the surveys were made by the Government, and thus informed himself whether any part of it extended to the land in controversy, made his affidavit, supported by that of Waggoner and Cryer afterwards; that in the year 1829, he cultivated fifteen or twenty acres, which he "believed, according to the map thereto annexed," (which was a copy of the map in the Land Office, marked with the names of Wynn, Garland, and Mrs. Taylor, on several of the tracts,) to be on the tract of land in controversy. There is the testimony by Yealoch, to the

effect that he saw Moore, the Government surveyor, run the line between the quarter sections of land in question, and that next east of it, in 1840, and plant the half mile stake in the prairie at the south end of the line between these two quarter sections, and that in the year 1842, that stake had been removed about 100 or 110 yards in a direction north-east from its original position : and by Edwards to the effect that he had seen the same line run seve-ral times after the Government survey, by Jett and Conway, and the place for the half mile stake thereby ascertained, (which by other witnesses is shown to have been within a few feet of the spot where Moore planted it in 1840,) and that in the latter part of January, or the first part of February, 1843, Garland pointed out to him a stake in his field as a half mile stake, which he stated to him the surveyor had put there, and requested him (the witness) who was then his overseer, not to let the negroes knock it down, and to keep a mound around it, and that this stake, so pointed out to him, was fixed sixty or seventy yards east, and near fifty yards north of where Jett and Conway found the true place for the half mile stake. It is to be remarked, that whether this stake was removed by design, or had been accidentally knocked down in the cultivation of the land around it by Garland, and planted again in an improper place without any fraudulent in-tent, it is not made to appear that its improper location led any one astray as to the true line. Wynn does not complain of it in his bill as having led him to make the admissions he did, in his corres-pondence with the Commissioner of the General Land Office ; Waggoner does not put his acknowledged mistake as to the cul-tivation of the land in controversy on this ground. On the con-trary, he says, that the half mile stake to which he went, and from which he looked through the compass, previous to making his supporting affidavit, (which he afterwards ignored by his testi-mony,) was within a few feet of the true point as afterwards so often ascertained by surveys; and Cryer does not admit that he was mistaken at all. Conceding it to be true, however, in point of fact, it may have had influence, as in that case it would have

almost inevitably, in fixing the impressions upon Cryer's mind, which unlike those made upon Waggoner's, seem never to have been removed, that the cultivation extended westward across the line on to the tract in controversy. Because, according to the whole testimony on the part of Wynn, the actual cultivation did extend westward to a limit within fifty or one hundred yards at most, of the true line between the two quarter sections of land.

And Brinlee, the only other witness who gives it, as his opinion, that the cultivation did extend westward beyond this line, thinks there was but about fifteen acres in all that did so; and that a part of this was upon the south-east quarter, though the larger portion of it was upon the land in controversy. His opinion was founded upon a visit to the premises in December, 1847, in company with Garland, and he states that commencing at the section corner they came down south by the marks on the timber, until reaching the lane in the prairie land in cultivation, and having on that course arrived at the half mile stake, (so often mentioned) then in that lane, they fixed the compass, and he looked both north, and east and west, and upon this examination in connection with his knowledge of the locality, many years before, he based that opinion. It is manifest, therefore, that his opportunity for accurate information as to the extent of the cultivation westward, was far less than that of the witnesses who labored upon it in the years in question; and who, besides, had the advantage in refreshing their memory by interchange of ideas, with those of equal information with themselves upon the ground, in reference to natural monuments, and visible remains of fences, houses, wells, &c., to none of which this witness refers as data for his opinion; although long absent from the locality on which such great changes had, in the mean time, been wrought by the opening of large plantations and the cultivation of prairie land, destitute of timber, where so soon every vestige of the natural production of the soil in its wild state becomes entirely obliterated, rendering it impossible for any one to know, from the appearance of the soil in its then condition, whether it had been cultivated a few

years only, or a longer time, as one would be enabled to do in timbered land, where for many years there would be the remains of trees and other native growth. Hence, as little weight is to be attached to his testimony as to Cryer's, if indeed so much. And all that remains to be considered, is the admissions of Wynn contained in his correspondence with the Commissioner of the General Land Officer.

It is not pretended that Garland has based any act of his upon these admissions of Wynn, which entitled him to insist upon them against him by way of estoppel. And it is manifest that Wynn could not have made them, although deliberately made in writing and several times repeated, upon facts within his own knowledge; because the bill and answer show that although he purchased from Jones in 1835, and at once took possession of the improvement purchased, and kept his slaves thereon thenceforward, and from that time occasionally made visits to the premises, he never actually became a continuous resident thereon, until about the year 1841, while Garland had been cultivating and extending the improvement, he had bought, adjoining, in the year 1834, from that time forward; and in February, 1841, as appears upon the face of the Government plats of survey, had some forty acres of the land in controversy enclosed within his plantation, and had been cultivating for some years the most, if not all of it, as the testimony seems to show. The parties up to that time, and for some time afterwards, perhaps for some two years afterwards, seeming to have been governed in their territorial claims as between themselves by some arbitrary line, that appears to have had its origin many years before, with those under whom they respectively claimed, when the locality had been regarded by the settlers as within the boundary of Texas:

If, therefore, there were any remains of old fences, or other objects to indicate with any probability the extent of the Hemphill improvemement westward, in 1829 and 1830, they were within the plantation of Garland, and not of Wynn, and were not likely to have attracted the latter's notice. And when the surveys had

been made, so much time had elapsed that these remains, under the influence of constant cultivation for so many years upon prairie land, so far as they were calculated te enable one to discriminate between such land cultivated for ten or twelve years, or for six or eight years only, must have been altogether obliterated. And it was not until then that there would be any reason to suppose that Wynn's special attention would have been called to such remains beyond the limits of his own plantation, upon his casual visits there. And it being not until then that he had become an actual permanent resident, it is much more likely that he would have been led into a mistake, upon such a foundation, than even Cryer or Brinlee. The only other sources of information left him, were hearsay, or the vague impressions of the neighbors, necessarily confused and unreliable from the nature of the soil upon which the cultivation was, and the changes made in the appearance of the locality by the improvements and cultivation in progress there, and the affidavits made in the Land Office in support of Hemphill's pre-emption.

At best, the admission of a fact, when not under such circumstances as to work an estoppel against the party making it, is but evidence of the existence of that fact. And when, by other evidence, it is established beyond any reasonable doubt that the fact admitted really never had existence, by witnesses who had the best opportunity, the nature of the case would admit of, to know whether or not it ever did exist, and it is at the same time shown that the party making the admission could not have known the fact admitted of his own knowledge, and had but hearsay to found his admission upon, it would be strange if that admission could weigh at all as evidence against the satisfactory testimony of witnesses who had the best opportunity to know the fact deposed to, and based their evidence upon their own personal knowledge.

Hence, we conclude that Wynn, having made out clearly by the testimony, that the cultivation and possession of Samuel Hemphill, in the years 1829 and 1830, did not extend to the tract of land in controversy, and no testimony having been produced to the con-

trary, sufficient in weight to create any reasonable doubt of the existence of that fact, thus established, we must consider it to be so established. The legal consequence is that the pre-emption right of Hemphill under the law of 1830, did not attach to the land in controversy for want of the cultivation and possession, required by that law.

And when the executive department, which had the power to sell the land to Hemphill only in accordance with law, sold this tract to him under the clear mistake of facts, that he had so cultivated and held possession, that department acted beyond the boundary of its power; and, consequently, as to all persons, who at that time could set up a better vested right to the land, founded upon the statute respecting the disposition of the public lands, as against the Government, that sale was a nullity. Wynn was at that time in a condition to do so, by virtue of his claim to the land in controversy, under the law of 1838, and he preferred and insisted upon that claim, and did all for its support that the law out of which it grew required of him. Here, then, was a case of cotemporaneous conflicting equitable claims to the same tract of land, and both, as against the Government, and preferred at the same time; it being immaterial, as to this latter, whether the prosecution of the one or the other had been in point of fact, first commenced in the District Land Office; because, before either was confirmed by final action of the Executive Department, they were both preferred to that department. And the executive, instead of pursuing the usual course in such cases, when the laws of the State will admit of it, of granting the certificate of purchase to one of the parties, and withholding the patent until the judiciary should have decided which had the better title, decided this judicial question for itself, and set aside the entry of Wynn and confirmed that of Hemphill, by the issuance of the patent to his assignee. Although that decision, as against the Government, may be conclusive in favor of Hemphill's claim, it cannot conclude the rights of Wynn as against Hemphill's claim, who does not claim, as against that, *under* the Government, but *against it.*

The claim of Wynn had already vested in the land before there was any pretence that it had been appropriated to Hemphill by the *forms of law*, and before it had ever been appropriated to him at all in *point of fact*, as we have seen from the testimony. And, therefore, even supposing that although Hemphill never did in point of fact cultivate according to the requisites of the law of 1830, and thereby acquire a valid pre-emption right, nevertheless as the Register and Receiver decided that he did, and thus concluded the Government in his favor on this point, he would thereby be entitled to the land, not only as against the Government, but as against all persons, and henceforward that would be such an appropriation of the land under the forms of law, as would prevent any future pre-emption right, afterwards to arise, from attaching to the same land; because, it would be not thenceforward unappropriated public lands. Yet, this could only be so in a case where there was, at *that time*, in *existence*, no valid pre-emption right to the same land; because, otherwise, it would be to say that the Government could grant a pre-emption right to land that was already appropriated. In other words, that it could give one man a pre-emption right upon the lands of another, or to which that other had a vested legal right, which no one will suppose to be within the power of the executive, although sanctioned by the mighty potency of a decision of the Register and Receiver.

It is beyond controversy that such a valid right of pre-emption did exist in Wynn, at the time when the executive decided in favor of Hemphill upon the ground of his supposed cultivation upon the tract of land in controversy, which is now shown by the evidence to be a clear mistake as to the identity of the tract of land, and as to which point no contestation whatever was ever had.

And the same department decided against Wynn, at the same time, simply and expressly upon the ground that the claim of Hemphill, under the prior law of 1830, had attached to the land in controversy, and was thus an insuperable obstacle in the way of Wynn's entry.

If the judicial power can afford Wynn no redress in this case, a great wrong must go without remedy. But upon no other ground can he be supposed to labor under any disability in this respect, not common to ordinary entries, than that his rights in the premises are in some way at the mercy of the Executive Department, whether that department proceeded, in reference to them, in accordance with law, or to the contrary; and hence, his common right to look to the judiciary for redress for wrongs is thereby abridged.

That idea is to find support alone from the provisions of the pre-emption laws in reference to the action of the Registers and Receivers upon these claims when preferred to them for allowance.

If it could be supposed that Congress ever designed that the decisions of these officers in such cases, were to be final upon the rights of adverse claimants, as between themselves, when both claimed the same tract of land, or against the Government, there is certainly no evidence of it in any provision of these laws for contestation between such parties as to such rights. And when pre-emption rights are regarded in the light of the decisions of the Supreme Court at Washington, in their true nature and character as defined by that court, it would seem strange that Congress should have ever designed that such substantial and important rights should be excluded from judicial cognizance and left to be finally passed upon by such a *quasi* court, armed with such imperfect means to administer justice in the premises.

It is true, that practically, under instruction from the Commissioner of the General Land Office, the Register and Receiver do in some cases decide upon conflicting claims, as between adverse claimants for the same tract of land, but this is only done incidentally in passing upon the claim of each claimant as between him and the Government, and as a means of enlightening the executive, as to whom it is apparently most proper to allow the entry and issue the patent, under the ordinary condition of the sales of the public land, that they are to be conducted by the Government in accordance with law.

Hence, there is but little reason to suppose that Wynn took his pre-emption right under any contract with the Government, that he would not resort to the judiciary to assert his rights against a third person, who might obtain the legal title to the land in which his pre-emption right vested, either by fraud or mistake. That was not one of the provisions of the law under which he derived his right, and a court of equity would be impotent to suppress fraud if it could not give him relief in such a case upon the ground of mistake merely; because, otherwise "it would be to allow an act, originating in innocence, to operate ultimately as a fraud, by enabling the party, who receives the benefit of the mistake, to resist the claims of justice under the shelter of a rule framed to promote it." 1 *Story's Equity* 155. It is "to prevent manifest wrong and to suppress fraud," (*Ib.* 166) that courts of equity grant relief in cases of mistake.

In the light of these views, we think Wynn entitled to relief upon this ground; and hence, it is unnecessary to examine the points made as to the sufficiency of the allegations of his bill, and the admissibility of some of the testimony as to the charge of fraud, in procuring the pre-emption right of Hemphill to be proved up; and will proceed to decree to him all such proper relief as is included in his prayer, and is within the scope of his bill.

Mr. Chief Justice ENGLISH said: I fully concur in the conclusion of the opinion just delivered in this case, that Wynn is entitled to the relief sought by the bill.

There are some portions of the theory of the opinion, however, as to which I deem it unnecessary to express a concurrence or dissent. My conclusion, that Wynn is entitled to the relief sought, is based upon the following predicates:

1. The authorities cited by the counsel for the parties, abundantly show that the decision of the Register and Receiver, upon the pre-emption claim of Hemphill, is examinable for fraud, if not for mistake.

2. Sufficient indications of fraud in proving up the Hemphill

31B

pre-emption, are deducible from the evidence, to warrant a court of equity, in a direct proceeding like this, to open the decision of the Register and Receiver.

3. The proof in the cause establishes the fact, beyond any reasonable doubt, that the cultivation of Hemphill did not extend to the tract of land in controversy; and, therefore, his claim to pre-emption was unfounded.

4. Wynn acquired a valid pre-emption right to the land, under the act of 1838.

So far as the opinion endorses the decision of the majority of this court in *Wynn vs. Morris & Taylor*, I dissent; remarking however, that the effect of the abandonment of the country by Hemphill upon his claim to pre-emption, is not properly in the case, as the claim turns out to have been unfounded.